# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 07-2481

_____

| | | |
|---|---|---|
| Shawanna Nelson, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| Correctional Medical Services; | * | District Court for the |
| Max Mobley, Doctor, | * | Eastern District of Arkansas. |
| | * | |
| Defendants, | * | |
| | * | |
| Larry Norris, Director of the ADC; | * | |
| Patricia Turensky, Officer, | * | |
| | * | |
| Appellants. | * | |
| _____ | * | |
| | * | |
| American College of Nurse Midwives; | * | |
| American Medical Women's | * | |
| Association; National Perinatal | * | |
| Association; Rebecca Project for | * | |
| Human Rights; Citizens for Midwifery; | * | |
| BirthNet, Inc.; The Bronx Health Link, | * | |
| Inc.; California National Organization | * | |
| for Women; Center for Reproductive | * | |
| Rights; Chicago Legal Advocacy for | * | |
| Incarcerated Mothers; The D.C. | * | |
| Prisoners' Project of the Washington | * | |
| Lawyers' Committee for Civil Rights | * | |
| and Urban Affairs; Florida Institutional | * | |
| Legal Services, Inc.; Justice Now; Law | * | |

Students for Reproductive Justice;      *
Legal Momentum; Legal Services for      *
Prisoners With Children; Lutheran       *
Social Services of Illinois Connections *
Program; Maternal and Child Health      *
Access; The Ms. Foundation for          *
Women; National Juvenile Justice        *
Network; National Women's Health        *
Network;  National Women's Law          *
Center;  National Women's Prison        *
Project; The New Mexico Women's         *
Justice Project; The Northwest          *
Women's Law Center; The National        *
Organization for Women Foundation;      *
Penal Reform International; Prison       *
Legal News; Prisoners' Legal Services   *
of New York; SisterSong Women of        *
Color Reproductive Health Collective;   *
Southwest Women's Law Center; Texas *
Jail Project; The Uptown People's Law   *
Center; Women on the Rise Telling Her   *
Story,                                  *
                                        *
        Amici on Behalf of Appellee.    *

_____

Submitted:  September 24, 2008
Filed:  October 2, 2009

_____

Before LOKEN, Chief Judge, WOLLMAN, MURPHY, BYE, RILEY, MELLOY,
SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges,
En Banc.

_____

MURPHY, Circuit Judge.

Shawanna Nelson brought this 42 U.S.C. § 1983 case asserting Eighth Amendment violations by Larry Norris, Director of the Arkansas Department of Correction (ADC), and ADC corrections officer Patricia Turensky. Nelson alleges that while giving birth to her child she was forced to go through the final stages of labor with both legs shackled to her hospital bed in violation of the Eighth Amendment. She alleges that Director Norris failed to ensure that appropriate policies for the treatment of pregnant inmates were implemented and that Officer Turensky, despite having witnessed her severe contractions and despite the expressed wish of medical personnel, failed to follow prison regulations requiring her to balance any security concern against the medical needs of the patient. Nelson asserts that a reasonable corrections officer would have known that she should not have been restrained by shackles while on the verge of giving birth and that she was in no condition to flee while her whole body was engaged in moving her baby to birth.

The district court denied the defendants' motions for summary judgment based on qualified immunity, and they appealed. After a panel of this court affirmed in part and reversed in part, we granted Nelson's petition for rehearing en banc and vacated the panel opinion. We now affirm the district court's denial of summary judgment to Officer Turensky but reverse with respect to Director Norris.

I.

Since this appeal is from a motion for summary judgment, we state the facts in the light most favorable to the nonmoving party. Humann v. KEM Elec. Coop., Inc., 497 F.3d 810, 811 (8th Cir. 2007). Nelson was a twenty nine year old nonviolent offender who was six months pregnant with her second child when she arrived at the McPherson Unit of the ADC on June 3, 2003. She went into labor on September 20 and presented herself at the prison infirmary at 3:00 pm. Shortly

thereafter Nelson began to cry out in pain, and by 3:25 pm her contractions were already only five to six minutes apart. The infirmary nurses determined that she must be immediately transported to a contracting civilian hospital to deliver her child. They requested a gate pass, a transport van, and an escort officer to get Nelson to the hospital.

Nelson was to be picked up in the sally port. To get there from the infirmary she had to be cleared through the central control gate and then walk down a long hallway nearly the length of a football field. Nurse Smith helped her leave the infirmary, and at the control gate the two met Officer Turensky, the assigned transportation officer. Turensky testified that after the group cleared the gate, she walked with Nelson the entire length of the hallway leading to the sally port.

Nurse Smith testified that Nelson had to stop twice on the way to the sally port because she was in so much pain "she couldn't walk" and had to lean against the wall for support. After the second or third time that Nelson's pain forced her to stop, Nurse Smith hollered to the sally port officers, "[a]s soon as I get [to the sally port], you better have the gate pass, because I want her out of here." Turensky wrote in her response to Nelson's prison grievance form that Lieutenant Williams had instructed her to "RUSH [Nelson] to the hospital [and] to NOT to [sic] take time for cuffs." (emphasis in the original). She nevertheless put handcuffs on Nelson as soon as they reached the sally port. Nurse Smith testified that before Nelson was able to get into the transport van, she "had one [contraction] . . . because I remember standing there and helping her breathe and then putting her in the van."

Officer Turensky and Nelson arrived at the hospital at 3:50 pm. Although Turensky later testified that Nelson neither said nor did anything to suggest she was an escape risk and that "she did not ever feel threatened by Nelson at any time," see Nelson v. Corr. Med. Servs., 533 F.3d 958, 961 (8th Cir. 2008), Turensky shackled Nelson's legs to a wheelchair and took her to the maternity

ward.  There, Nelson changed into a hospital gown and Turensky shackled both of her ankles to opposite sides of her hospital bed.  According to Turensky's own entry in her security check log, Nelson's cervix had dilated to 7 centimeters by that time.  This meant that Nelson was well into the final stage of labor when Turensky shackled her.[1]  Nelson asked for an epidural anesthesia to ease her pain, but the nurses said she would have to wait for approval from the obstetrician, Dr. Hergenroeder, who was on his way.

According to Nelson's testimony, the shackles prevented her from moving her legs, stretching, or changing positions.  A nurse told Officer Turensky that "[s]he wished that they wouldn't have to put those restraints on" Nelson, but to no avail.  Each time a nurse needed to measure Nelson's dilation, that nurse had to ask Turensky to unshackle her.  Although it was clear that Nelson was in the final stages of labor and no one on the hospital staff ever requested that she be reshackled, Nelson testified that Turensky "hooked [her] right back up" to the bed rails after each cervical measurement was taken.  Turensky herself noted in her security check log that by 4:38 pm Nelson was dilated to 8 centimeters.

Dr. Hergenroeder arrived at 5:00 pm.  According to his testimony he was only able to prescribe Tylenol to ease Nelson's pain because by that time it was too close to the delivery of her baby for an epidural.  Turensky noted in her log that by

---

[1] Dilation refers to the opening of the cervix and is measured in centimeters, from 1 to 10.  Mayo Clinic Complete Book of Pregnancy & Baby's First Year 279 (Robert V. Johnson ed., 1994).  The active labor phase begins when the cervix is dilated 4 centimeters and the final phase begins when the cervix is dilated 7 to 8 centimeters.  See Beverly F. Gorvine et al., Health Care of Women: Labor & Delivery 22-25 (Wadsworth 1982). Nelson alleges that she was 100% effaced when she arrived in the maternity ward, meaning that her cervix was already thinned and ready for vaginal delivery.  Cf. Mayo Clinic Complete Book of Pregnancy & Baby's First Year, supra, at 278.

5:13 pm Nelson was dilated to 9 centimeters and that two nurses were helping her push her baby along the birth canal.  Turensky also noted at 5:40 pm that Nelson was feeling sick.  At 6:15 pm she was taken to the delivery room where her baby boy was born at 6:23 pm.  Nelson's shackles were apparently removed at Dr. Hergenroeder's request before she went into the delivery room.  At 6:40 pm Turensky went off duty and left the hospital.

Nelson asserts that as a result of being shackled during her labor, she was unable to move her legs or stretch during "the most painful and stressful" part of it. She produced evidence that the shackling caused her extreme mental anguish and pain, permanent hip injury, torn stomach muscles, and an umbilical hernia requiring surgical repair.  She has also alleged damage to her sciatic nerve. According to Nelson's orthopedist, the shackling injured and deformed her hips, preventing them from going "back into the place where they need to be."  In the opinion of her neurosurgeon the injury to her hips may cause lifelong pain, and he therefore prescribed powerful pain medication for her.  Nelson testified that as a result of her injuries she cannot engage in "ordinary activities" such as playing with her children or participating in athletics.  She is unable to sleep or bear weight on her left side or to sit or stand for extended periods.  Nelson has also been advised not to have any more children because of her injuries.

Turensky had been a correctional officer at McPherson for approximately six years at the time Nelson went into labor on September 20, 2003.  During her prison orientation Turensky had received training on the laws and regulations governing hospital transports, and she had participated in at least forty hours of additional classroom training each year.

Several of the ADC regulations specifically applied to the shackling of prisoners.[2]  Administrative Regulation 403, for example, stated the ADC policy that shackles were to be used "only when circumstances require the protection of inmates, staff, or other individuals from potential harm or to deter the possibility of escape."  Ark. Dep't of Corr. Admin. Reg. 403 § V (1992).  Administrative Directive 95:21 required any officer responsible for transporting an inmate to a hospital to "use good judgment in balancing security concerns with the wishes of treatment staff and the medical needs of the inmate" before shackling an inmate during a hospital stay.  Ark. Dep't of Corr. Admin. Dir. 95:21 § (IV)(B)(4)(c) (1995).  If security concerns appeared to conflict with an inmate's medical needs, transportation officers were required to contact superiors "immediately" for guidance.  Id.

Nelson brought § 1983 claims against Norris and Turensky, alleging violations of the Eighth Amendment and seeking compensatory and punitive damages.  Nelson claimed that, (1) Turensky subjected her to cruel and unusual punishment by shackling her legs to a hospital bed while she was in the final stages of labor, and (2) Norris failed to ensure that proper policies and customs were implemented with respect to the restraint of female inmates in labor.[3]  Norris and Turensky moved for summary judgment based on qualified immunity, arguing

---

[2]The dissent cites a Yahoo! News article reporting that New York has now joined other states which have statutes restricting the use of shackles on prisoners going through labor.  Accompanying that news was a comment by the governor that "[a] woman giving birth to a child is hardly the first person that is going to be thinking of trying to escape or create any kind of problem."  Cristian Salazar, N.Y. May Ban Shackling Pregnant Inmates, Boston Globe, Aug. 26, 2009, at 4.

[3]Nelson brought additional claims against Norris and Turensky (and several other defendants, including Correctional Medical Services and Dr. Max Mobley) but they were dismissed by the district court and are not at issue on appeal.

their actions did not violate any of Nelson's clearly established constitutional rights. After the district court examined the record, it concluded that a jury could find that a reasonable official "would have known that shackling [Nelson's] legs to a bed post while she was in labor, without regard to whether she posed a security or flight risk, violated her Eighth Amendment rights." It therefore denied Turensky and Norris's motion for qualified immunity. After a panel of this court reversed the district court, we granted Nelson's petition for rehearing en banc and vacated the panel opinion.

## II.

Qualified immunity may protect government officials from liability under 42 U.S.C. § 1983, but not if their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotation omitted). In addition to protection from liability, "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001) (quotation omitted).

We review de novo the district court's denial of a motion for summary judgment on the basis of qualified immunity. Plemmons v. Roberts, 439 F.3d 818, 822 (8th Cir. 2006). In doing so we grant the nonmoving party "the benefit of all relevant inferences." Id. (quotation omitted). "[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001) (quoting Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999)). At this stage we are prohibited from weighing evidence or making credibility determinations. Id. at 634.

In analyzing the officials' claim of qualified immunity we consider two questions: (1) "whether the facts that a plaintiff has alleged or shown," when

viewed in the light most favorable to Nelson, support a finding that the conduct of Turensky or Norris violated a constitutional right, and (2) whether that constitutional right was "clearly established" in September 2003 such that a reasonable official would have known that his or her actions were unlawful.  See Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009) (citations omitted); see also Saucier, 533 U.S. at 201.  Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions.  See Plemmons, 439 F.3d at 822.

Until recently, our analysis of qualified immunity was constrained by the two step sequence set forth in Saucier, which required us to ask first whether "the facts alleged show the officer's conduct violated a constitutional right."  533 U.S. at 201.  Under Saucier, only if the allegations and any evidence, when viewed in a light favorable to the nonmoving party, established a constitutional violation were we permitted to ask "whether the right was clearly established at the time of the deprivation . . . ."  Id. at 201.  In Pearson, 129 S. Ct. at 818, the Supreme Court held that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory," and courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  We conclude that it is appropriate in this case to start with the question of whether the allegations and evidence, when considered in Nelson's favor, establish any constitutional violation.

## A.  Officer Turensky

### 1.

The Eighth Amendment "prohibits the infliction of cruel and unusual punishments on those convicted of crimes."  Wilson v. Seiter, 501 U.S. 294, 296-97 (1991) (quotation omitted).  In order to make out an Eighth Amendment

violation "the offending conduct must be <u>wanton</u>."  <u>Id.</u> at 302 (emphasis in the original).  The word "wanton[] does not have a fixed meaning" and its meaning in the Eighth Amendment context depends upon the circumstances in which the alleged violation occurs.  <u>Id.</u>  In cases involving prison riots, for example, wantonness is demonstrated by acting "maliciously and sadistically for the very purpose of causing harm."  <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986) (quotation omitted).  The Eighth Amendment standard for conditions of confinement and medical care such as those raised here is different, and the constitutional question in this case is whether Turensky acted with "deliberate indifference."  <u>See</u> <u>Wilson</u>, 501 U.S. at 303 (quotation omitted).

A prison official is deliberately indifferent if she "knows of and disregards" a serious medical need or a substantial risk to an inmate's health or safety.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  A claim of deliberate indifference has both an objective and a subjective component.  <u>See</u> <u>id.</u> at 838-39.  Thus, the relevant questions here are: (1) whether Nelson had a serious medical need or whether a substantial risk to her health or safety existed, and (2) whether Officer Turensky had knowledge of such serious medical need or substantial risk to Nelson's health or safety but nevertheless disregarded it.  <u>See</u> <u>id.</u> at 842.

Nelson's expert, Dr. Cynthia Frazier, testified by affidavit "to a reasonable degree of medical certainty, that [shackling] is inherently dangerous to both the mother and the unborn fetus" and that it may interfere with the response required "to avoid potentially life-threatening emergencies for both the mother and the unborn fetus."  A factfinder could determine from the record evidence  that Turensky disregarded the risks to Nelson by shackling her while she was in the final stages of labor and by keeping her in shackles (except for intervening medical exams) until shortly before her baby was born.

To establish an Eighth Amendment violation Nelson need not show that Turensky actually believed that shackling her during labor would harm her, for "it

is enough that the official acted or failed to act despite [her] knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. Whether or not Officer Turensky knew that shackling presented a substantial risk to Nelson "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (citation omitted). That Turensky lacked medical training, that the hospital staff did not explicitly forbid the use of shackles, or that Nelson did not expressly state how painful and uncomfortable they were, is thus inconclusive (although at trial it "remains open to the official[] to prove that [she was] unaware even of an obvious risk to [Nelson's] health or safety," id. at 844).

A reasonable factfinder could determine that there is substantial evidence of Turensky's own general awareness of the risk of harm from shackling a woman in labor. During her deposition Turensky admitted that, "[i]f you've got a very old sickly woman who's had three or four strokes, of course you don't want to put shackles on that inmate. That is just common sense. I do the same thing with pregnant inmates. I would not shackle a pregnant inmate." (emphasis supplied). When asked what it is about shackling pregnant inmates that bothered her, Turensky responded, "It's not in policy – if it were in policy, I would have to tell them that there's something wrong with the policy . . . ."[4] (emphasis supplied). Turensky also appeared troubled by the fact that "you just cannot examine anyone with shackles on. They're not very sanitary." (emphasis supplied). Finally, Turensky admitted that she "imagine[d] they hurt the ankles when you're lying in bed." (emphasis supplied).

---

[4]Turensky later stated that she shackled Nelson despite her own reservations because she understood it to be required, but her earlier statement that shackling "i[s] not in policy" belies that contention. Summary judgment is inappropriate where the record contains conflicting facts relevant to the issue of qualified immunity. Tlamka, 244 F.3d at 632.

Officer Turensky was also put on notice that her actions could interfere with required medical care and aggravate Nelson's already considerable pain and suffering. She had been present when Nelson was forced by powerful contractions to brace herself against the prison wall and when Nurse Smith shouted to officials in the sally port that Nelson had to be taken to the hospital as soon as possible. Turensky was instructed by a prison official to "RUSH" Nelson to the hospital and "to NOT to [sic] take time for cuffs." She was present at the sally port when Nelson required a nurse's assistance and in the maternity ward when Nelson requested an epidural. Turensky noted in her log that Nelson was feeling sick, and she was present while two nurses had to help Nelson push her baby along the birth canal. She was repeatedly required to remove Nelson's shackles so medical personnel could examine her. Turensky was informed by a nurse in the maternity ward that she wished that Nelson was not being restrained by shackles.

There is no contradictory evidence suggesting that Turensky's decisions to place the shackles on Nelson initially and to reshackle her after each medical examination were made in reliance on the judgment of medical personnel. No medical personnel ever requested that Nelson be shackled or requested their reapplication following an examination. Indeed, repeated requests to unshackle Nelson to permit medical examinations and at least one explicit expression of dissatisfaction with the shackling (nurse who "wished" Nelson might remain unshackled) are evidence of a medical judgment that Nelson should not have been shackled at all while in the final stages of labor. Moreover, there is nothing in the record to indicate that any medical personnel other than Dr. Hergenroeder believed they could demand that the shackles be set aside. On the contrary, the fact that Turensky continued to reshackle Nelson after one nurse expressed her wish that Nelson not be shackled could have reasonably led other medical personnel to believe that Turensky would not be influenced by their wishes.

From all this evidence a factfinder could draw the inference that Turensky recognized that the shackles interfered with Nelson's medical care, could be an

obstacle in the event of a medical emergency, and caused unnecessary suffering at a time when Nelson would have likely been physically unable to flee because of the pain she was undergoing and the powerful contractions she was experiencing as her body worked to give birth.  See Heidi Murkoff et al., What to Expect When You're Expecting 364-67 (3d ed. 2002) (pain, nausea, vomiting, exhaustion, oxygen deprivation, and inability to walk are incident to final stages of labor).[5]

While "deliberate indifference to a prisoner's serious illness or injury can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff," Whitley, 475 U.S. at 320, from the record evidence in Nelson's case there does not even appear to have been a competing penological interest in shackling her, see, e.g., Hope, 536 U.S. at 738 ("Despite the clear lack of an emergency situation, the respondents knowingly subjected [petitioner] to a substantial risk of physical harm . . . .").  According to Turensky's own testimony, Nelson was not threatening or belligerent at any point. Turensky responded "[n]o" when asked whether Nelson "sa[id] or d[id] anything that made [her] think she was an escape risk."  Nurse Smith testified that Nelson was "[e]xtremely quiet, very nice, never caused any problems.  I never had any trouble with her."  Moreover, according to Turensky's own notes, Nelson required the assistance of medical staff to push her unborn child along the birth canal, to

---

[5]A factfinder could also determine Turensky was aware of the risks involved because they were obvious.  See Farmer, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").  That labor is inherently risky is well known.  Cf. Vaughn v. Gray, 557 F.3d 904, 906-10 (8th Cir. 2009) (risk of heart attack obvious where overweight man vomited several hours after consuming shampoo).  Each year approximately 530,000 women die during childbirth, World Health Organization, Maternal Mortality in 2000 (2004), and the hazards associated with labor and childbirth have entered the collective consciousness having been frequently portrayed in popular media such as the all time favorite Gone With The Wind.

complete the process of separation of mother and child that is birth.  Turensky also recorded in her log that Nelson became ill during the course of labor.

A reasonable factfinder could determine from the record evidence that Nelson did not present a flight risk while under the supervision of Turensky, an experienced correctional officer who was equipped with a fire arm.  Turensky's statement during discovery that she had "doubts" and was "a tad nervous" because Nelson "was talking about how she should not be considered an inmate because she was in the free world in a free-world hospital" does not compel a different conclusion.  A factfinder viewing that statement in the light most favorable to Nelson, as it be must on summary judgment, <u>Plemmons</u>, 439 F.3d at 822, could very well interpret it as Nelson's expressed wish to be able to give birth in the normal manner without being shackled to the bed.  Moreover, summary judgment is prohibited where there are contradictory facts relevant to the issue of qualified immunity.  <u>Tlamka</u>, 244 F.3d at 632.

2.

Having determined that there is sufficient evidence in the record to permit a reasonable factfinder to determine that Turensky's actions violated the Eighth Amendment, the question remains whether such a constitutional right was clearly established in September 2003.  A constitutional right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ."  <u>Hope</u>, 536 U.S. at 739 (quotation omitted).  The Supreme Court "has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the constitution."  <u>Young v. Selk</u>, 508 F.3d 868, 875 (8th Cir. 2007) (<u>quoting</u> <u>Hope</u>, 536 U.S. at 741).  Instead, the unlawfulness must merely be apparent in light of preexisting law.  <u>Hope</u>, 536 U.S. at 739, and officials

-14-

"can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

Notice of constitutionally impermissible conduct may be provided by the Constitution itself or the decisions of the United States Supreme Court and the lower federal courts. See Hope, 536 U.S. at 741-42. "Prison regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established." Treats v. Morgan, 308 F.3d 868, 875 (8th Cir. 2002). A review of these sources confirms that the constitutional right asserted by Nelson was clearly established in September 2003.

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and well before September 20, 2003 the Supreme Court and the lower federal courts had concluded that the Amendment forbids actions like those taken by Turensky in shackling Nelson. In 2002, the Supreme Court provided guidance to officials on the constitutional limits in restraining prisoners in a § 1983 action brought by an inmate alleging that his Eighth Amendment rights had been violated by officials responsible for handcuffing him to a prison hitching post. Hope, 536 U.S. at 733-35. The Court determined that defendant prison officials had acted with deliberate indifference to the inmate's health and safety in violation of the Eighth Amendment by restraining him "[d]espite the clear lack of an emergency situation" in a manner "that created a risk of particular discomfort and humiliation." Id. at 737-38. A reasonable factfinder could determine from the record in this case that Officer Turensky, like the Hope officials, was not facing an emergency situation but nevertheless "subjected [Nelson] to a substantial risk of physical harm, to the unnecessary pain caused by the [shackles] and the restricted position of confinement . . . [and] created a risk of particular discomfort and humiliation." See id. at 738.[6]

---

[6]The dissent would avoid the rule of Hope by distinguishing its facts and contending that Nelson "was not being punished, was not made to suffer unnecessarily

The general responsibilities of state officers with regard to an inmate's medical needs were also clearly established before September 2003. In 1976 the Supreme Court had decided <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), a leading case in the development of Eighth Amendment law. <u>Estelle</u> was a § 1983 action brought against prison officials for providing an inmate inadequate medical care. <u>Id.</u> at 98. The Court concluded that either interference with care or infliction of "unnecessary suffering" establishes deliberate indifference in medical care cases in violation of the Eighth Amendment. <u>Id.</u> at 103-05. Whether an official such as Turensky interfered with Nelson's medical care or inflicted unnecessary suffering on her is a question squarely raised by the evidence in the record before this court. <u>See, e.g.</u>, <u>Farmer</u>, 511 U.S. at 842 (official violates Eighth Amendment in condition of confinement cases where he "act[s] or fail[s] to act despite his knowledge of a substantial risk of serious harm"); <u>Tlamka</u>, 244 F.3d at 633 (Eighth Amendment violated in medical care cases where official disregards "obvious" risk to inmate); <u>Coleman v. Rahija</u>, 114 F.3d 778, at 786 (8th Cir. 1997) (official violates pregnant inmate's Eighth Amendment rights when she fails to act in the face of an "obvious[]" risk of harm).

Moreover, the precise issue under consideration here was decided years ago by a federal district court in the District of Columbia. In 1994 that court held that "[w]hile a woman is in labor . . . shackling is inhumane" and violates her constitutional rights. <u>Women Prisoners of D.C. Dep't of Corr. v. District of</u>

---

and wantonly, and was not deprived of basic necessities of life." <u>Infra</u> at 29. The Eighth Amendment is not limited to disciplinary cases, however, and whether Nelson was "made to suffer unnecessarily and wantonly" is a question for the factfinder. Here, the key constitutional issue is whether Nelson posed a security risk sufficient to justify being shackled to both sides of the bed while she labored to deliver her baby. Viewing the facts in the light most favorable to Nelson, as must be done on summary judgment, her shackling may be found unnecessary and wanton.

Columbia, 877 F. Supp. 634, 668-69 (D.D.C. 1994), modified in part on other grounds, 899 F. Supp. 659 (D.D.C. 1995). The court held defendant prison officials liable, explaining that a prison official who shackles a woman in labor acts with "deliberate indifference . . . since the risk of injury to women prisoners is obvious." Id. at 669. The court found it significant that one prison official had shackled a pregnant inmate even though he himself later stated "that he would not shackle a third trimester woman," from which the court concluded "that he recognize[d] the risk." Id. Turensky's similar admission could also be found to show that she applied the leg restraints on Nelson despite recognizing the risks involved in shackling her during labor. These constitutional holdings in Women Prisoners were never appealed and they remained in effect at the time Nelson went into labor. See Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910 (D.C. Cir. 1996).

Although an Eighth Amendment claimant need not identify a factually identical case to satisfy the "clearly established" requirement, see Hope, 536 U.S. at 739 (quoting Anderson, 483 U.S. at 640), it is beyond question here that a federal court had found constitutional violations on essentially the same facts some seven years earlier in a widely reported decision. The value of that precedent was supported by the government's decision not to contest these constitutional holdings in its appeal to the D.C. Circuit, and the circuit court expressed no concern about them in its review of the record. Women Prisoners, 93 F.3d at 918.

Nelson's protections from being shackled during labor had thus been clearly established by decisions of the Supreme Court and the lower federal courts before September 2003. The ADC administrative regulations in effect also reflected the constitutional protections recognized in these judicial decisions.[7] Regulation 403,

---

[7] In Haslar v. Megerman, 104 F.3d 178 (8th Cir. 1997), upon which the dissent relies heavily, the constitutional issue was whether a shackling *policy* violated the Eighth Amendment. Here, we agree with the dissent that the challenged policies are

for example, prescribed restraints "<u>only</u> when circumstances require the protection of inmates, staff, or other individuals from potential harm or to deter the possibility of escape." Ark. Dep't of Corr. Admin. Reg. 403 § V (1992) (emphasis supplied). In addition, Administrative Directive 95:21 required a transportation officer taking an inmate to a hospital for a medical emergency such as childbirth to "use good judgment in <u>balancing</u> security concerns with the wishes of treatment staff and the medicine needs of the inmate." Ark. Dep't of Corr. Admin. Dir. 95:21 § IV(B)(4)(c) (1995) (emphasis supplied). If security concerns could conflict with an inmate's medical needs, transportation officers were required to seek guidance from their superiors. <u>Id.</u> Nothing in the ADC's regulation or directive suggested that officials were required to shackle pregnant inmates who were in the final stages of labor in a civilian hospital.[8]

Since these rules were in effect when Turensky was hired, trained, and retrained and remained in effect when she accompanied Nelson to the hospital, her knowledge of them is presumed and they applied to her decisions and actions in September 2003. <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19 (1982) ("a reasonably competent public official should know the law governing his conduct"). In addition to this presumption of knowledge, the record indicates that Turensky had actual knowledge that any competing interests must be balanced. As she explained, "[i]f you've got a very sickly old woman who's had three or four strokes, of course you don't want to put shackles on that inmate. That is just common sense. I do the same thing with pregnant inmates."

---

constitutional. The question is whether Officer Turensky complied with them. The record shows that she did not.

[8]The dissent focuses on a new administrative order providing that inmates in the delivery room should not be shackled. Ark. Dep't of Corr. Hosp. Sec. Post Order § (III)(A)(3) (2003). Since the focus of Nelson's constitutional challenge is on the period before she was taken to the delivery room, Administrative Regulation 403 and Directive 95:21 were the regulations applicable to Turensky's conduct.

The record suggests that a factfinder could determine that Turensky entirely disregarded her duty to balance these competing concerns.  A fair reading of the record, including Turensky's testimony, establishes that Nelson did not present a flight risk or other security concern and that at least one medical professional considered the shackles to be an interference with her medical needs.  Moreover, Turensky's own testimony indicates that she was aware that shackling a woman in labor was hazardous and contrary to medical needs.  There is no evidence that she utilized any of this information to "balanc[e] security concerns with the wishes of treatment staff and the medicine needs of the inmate" as required by prison regulations.  See Ark. Dep't of Corr. Admin. Dir. 95:21 § IV(B)(4)(c) (1995).  Nor is there any evidence that she contacted her superiors for guidance.  See id.

Existing constitutional protections, as developed by the Supreme Court and the lower federal courts and evidenced in ADC regulations, would have made it sufficiently clear to a reasonable officer in September 2003 that an inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk.  Indeed, "[t]he obvious cruelty inherent in this practice should have provided [Turensky] with some notice that [her] alleged conduct violated [Nelson's] constitutional protection against cruel and unusual punishment. [Nelson] was treated in a way antithetical to human dignity . . . and under circumstances that were both degrading and dangerous."  Hope, 536 U.S. at 745.  For these reasons, the district court did not err in concluding that the constitutional rights asserted by Nelson were clearly established at the time.

Our obligation at this stage of the case is not to resolve the ultimate issue of whether Shawanna Nelson can prevail on her § 1983 claims against Officer Turensky.  Our task is only to examine the record before the district court to determine whether it erred in denying the officer qualified immunity under the relevant summary judgment standard.  See Plemmons, 439 F.3d at 822.  Since Nelson produced sufficient evidence to demonstrate that Officer Turensky violated her clearly established Eighth Amendment rights by shackling her during labor,

-19-

"the basic concept underlying the Eighth Amendment [being] nothing less than the dignity of [wo]man," Hope, 536 U.S. at 738 (quotation omitted), the judgment of the district court denying Officer Turensky qualified immunity is affirmed.

## B.  Director Norris

Nelson claims that Director Norris violated her Eighth Amendment rights by failing to ensure that proper policies and customs were implemented with respect to the restraint of female inmates in labor.[9]  In a § 1983 case an official "is only liable for his . . . own misconduct" and is not "accountable for the misdeeds of [his] agents" under a theory such as respondeat superior or supervisor liability. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948-49 (2009).  Norris is thus liable only if he personally displayed deliberate indifference to the hazards and pain resulting from shackling an inmate such as Nelson during the final stages of labor.  Farmer, 511 U.S. at 842.  Nelson does not contend, nor does the record reflect, that Norris had any personal involvement in Turensky's decision to keep Nelson restrained while she was in labor.  Indeed, there is no evidence that Norris, who was responsible for managing a large state wide prison system, had any personal knowledge of Nelson or the medical care she was receiving.

---

[9]In her petition for rehearing en banc, Nelson focused only on her case against Turensky:

> The narrow question raised in this petition for rehearing or rehearing en banc is whether Ms. Nelson is entitled to proceed to trial to prove her claim that Defendant Turensky violated the Eighth Amendment when she shackled Ms. Nelson during labor and post-partum recovery.

We must nevertheless address Norris's appeal from the district court order denying Norris summary judgment since the panel opinion has been vacated.

On September 20, 2003, the ADC had in place regulations and directives relevant to inmates like Nelson (and on which corrections officers received annual training). For example, Administrative Regulation 403, which concerned the use of restraints, provided that shackles were to be used "only when circumstances required the protection of inmates, staff, or other individuals from potential harm or to deter the possibility of escape." Ark. Dep't of Corr. Admin. Reg. 403 § V (1992). Administrative Directive 95:21, which described the responsibilities of, and procedures to be used by, officers transporting inmates outside ADC facilities stipulated that "[t]ransportation officers are expected to use good judgment in balancing security concerns with the wishes of treatment staff and the medicine needs of the inmate." Ark. Dep't of Corr. Admin. Dir. 95:21 § (IV)(B)(4)(c) (1995). The directive further indicated that where security concerns and medical needs appeared to conflict transportation officers were required to contact superiors for guidance. Id. While the directive did not specifically address the use of restraints on pregnant inmates, it recognized that in certain situations "removal of restraints is essential to provide adequate assessment or treatment" to the inmate. Id. at § (IV)(B)(4)(a). The regulation suggests a similar attention to the well being of inmates.

Also in place on September 20, 2003, was the ADC Newport Complex Hospital Security Post Order. The post order, which became effective on August 1, 2003, contained instructions for officers providing security to inmates in a hospital setting.[10] The post order required officers to be familiar with the ADC restraint policy, and provided the following additional instructions for the use of restraints on pregnant inmates: "Pregnant inmates in the final stages of labor will

---

[10]Although the record does not contain any evidence indicating that Turensky's training had included the post order (it was only issued several weeks before Nelson gave birth), and that order did not govern before Nelson entered the delivery room, its existence is evidence of administrative attention to the health and safety of inmates.

-21-

not be restrained while in the delivery room giving birth, or at any time the physician in charge determines that such application would be a health risk to the unborn child or the health of the inmate." Ark. Dep't of Corr. Hosp. Sec. Post Order § (III)(A)(3)(2003). The focus of Nelson's constitutional challenge, however, is on the period before she was taken to the delivery room where she was attended by Dr. Hergenroeder.

The regulations, directives, and orders in the record suggest administrative concern for the health and safety of pregnant inmates. Without further allegation or evidence of deliberate indifference, Nelson's Eighth Amendment claim against Norris must fail. We conclude therefore that the district court erred in denying summary judgment to Director Norris based upon qualified immunity.

III.

For the foregoing reasons the judgment of the district court denying summary judgment based on qualified immunity to Officer Turensky is affirmed but its judgment denying summary judgment based on qualified immunity to Director Norris is reversed. The case is remanded to the district court for entry of judgment in favor of Director Norris and for trial of the Eighth Amendment issues raised by Shawanna Nelson against Officer Turensky.

RILEY, Circuit Judge, with whom LOKEN, Chief Judge, and COLLOTON, GRUENDER, and SHEPHERD, Circuit Judges, join, concurring in part and dissenting in part.

I agree with the majority's conclusion in Part II.B that Director Norris is entitled to summary judgment based upon qualified immunity, but I respectfully dissent from Part II.A and Part III of the opinion, denying summary judgment to Officer Turensky.

The majority exposes Officer Turensky, a female prison guard, to personal tort liability under the guise of an alleged Eighth Amendment violation. Officer Turensky's duty was to deliver Nelson safely to a hospital and into the care of trained, professional medical personnel. She did that. Officer Turensky (1) complied, at all times, with the requests of the medical personnel, including removal of the restraints; (2) used restraints on Nelson because Officer Turensky believed she was required to do so as part of her job duties; and (3) acted in accordance with all relevant ADC policies and procedures. Even if the majority were correct that Nelson's allegations against Officer Turensky could rise to a constitutional violation, under the circumstances of this case, a reasonable officer would not have had fair notice and understood Nelson had a clearly established constitutional right to be free from restraints.

## I.     No Clearly Established Right to be Free From Restraints

As the majority correctly observes, in light of the Supreme Court's decision in <u>Pearson v. Callahan</u>, __ U.S. __, __, 129 S. Ct. 808, 818 (2009), courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Because I believe the "clearly established" prong of the qualified immunity analysis is patently dispositive in this case, I shall primarily address and rely upon that prong.

We review the "clearly established" prong de novo. <u>Elder v. Holloway</u>, 510 U.S. 510, 516 (1994). Nelson bears the burden to show a right is clearly established. <u>See</u> <u>Davis v. Scherer</u>, 468 U.S. 183, 197 (1984); <u>Purtell v. Mason</u>, 527 F.3d 615, 621 (7th Cir. 2008).

In order to conclude that the right which Officer Turensky allegedly violated was clearly established on September 20, 2003, "[t]he contours of the right must be sufficiently clear that a reasonable official would [have understood] that what [she was] doing violate[d] that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). The majority opinion falls far short of demonstrating Nelson sufficiently

bore her burden to prove a reasonable prison guard would have understood the restraint of Nelson violated a clearly established constitutional right.[11]

The United States Supreme Court has not addressed the constitutionality of the use of restraints on a pregnant inmate during labor, nor have any circuit courts, nor have any district courts in our circuit. Other than a single district court opinion from outside of our circuit, later vacated on various other grounds, no other court has considered the constitutionality of such a use of restraints. See Women Prisoners of D.C. Dep't of Corr. v. Dist. of Colum., 877 F. Supp. 634 (D.D.C. 1994) (Women Prisoners I), modified in part on other grounds by 899 F. Supp. 659 (D.D.C. 1995), vacated in part and remanded, 93 F.3d 910 (D.C. Cir. 1996) (Women Prisoners II).

In Women Prisoners I, a class of women prisoners housed in District of Columbia (D.C.) corrections facilities challenged various practices and policies of the D.C. Department of Corrections, including the restraint policy for pregnant inmates during medical visits. The D.C. district court found that shackling a woman during labor "violate[d] contemporary standards of decency," was "inhumane," and violated the Eighth Amendment. Id. at 668. The D.C. district court discovered this constitutional right and its violation without citing any authority for its holding.

---

[11]The majority analyzes and includes portions of Officer Turensky's deposition testimony in its discussion of the clearly established prong of the qualified immunity analysis. See ante at 17, 19. This discussion of Officer Turensky's personal knowledge or awareness, and how Officer Turensky may balance that personal knowledge, is not helpful. With this prong of the qualified immunity analysis, we are concerned only with whether a *reasonable officer* would have understood his or her actions were violating a constitutional right. See Anderson, 483 U.S. at 640. The test is an objective one, not subjective as to Officer Turensky.

The defendants appealed to the D.C. Circuit, and the D.C. Circuit vacated several portions of the district court opinion. See Women Prisoners II, 93 F.3d at 913. The defendants did not appeal the portion of the district court opinion discussing the restraint of pregnant inmates, and the D.C. Circuit had no occasion to consider that issue. See id. at 918.

Based upon this single vacated district court opinion, the majority proclaims Nelson had a clearly established constitutional right to be free from restraints during labor.[12] Granted our court previously held we may look to decisions of other federal and state courts in considering whether a constitutional right is clearly established, see Turner v. Ark. Ins. Dep't, 297 F.3d 751, 755 (8th Cir. 2002) (quoting Vaughn v. Ruoff, 253 F.3d 1124, 1129 (8th Cir. 2001)); however, one unchallenged portion of a vacated district court opinion from outside our circuit is not sufficient here to create a clearly established constitutional right. Other courts would agree. See Edens v. Kennedy, 112 F. App'x 870, 876 (4th Cir. 2004) (holding one nonprecedential case in Washington state did not make "clearly

---

[12]Without citation to the record or otherwise, the majority declares the D.C. district court's decision in Women Prisoners I, 877 F. Supp. 634, was "a widely reported decision." Regardless of whether the majority is correct that the decision was widely reported, the decision certainly has not been widely accepted. I have not discovered any courts in the last fifteen years which have accepted the reasoning of the vacated Women Prisoners I decision, and as a recent news article explained, "The use of restraints on pregnant prisoners, even after they go into labor, is widely accepted throughout the United States," and only six states now ban the practice of restraining pregnant inmates during labor. New York Law Limits Shackling of Pregnant Prisoners, Yahoo!® News, (Aug. 27, 2009) (available at http://news.yahoo.com/s/afp/20090827/ts_alt_afp/usprisonsociety_20090827221449 (last accessed Sept. 18, 2009)). See also Amnesty International USA, Fact Sheet: Stop V i o l e n c e   A g a i n s t   W o m e n , http://www.amnestyusa.org/violence-against-women/abuse-of-women-in-custody/fact-sheet-shackling-of-pregnant-prisoners/page.do?id=1108308 (last accessed Sept. 18, 2009) ("Shackling of all prisoners, including pregnant prisoners, is policy in federal prisons and the US Marshall [sic] Service and exists in most state prisons.").

established" law in West Virginia); <u>Stump v. Gates</u>, 986 F.2d 1429 (10th Cir. 1993) (unpublished) ("This court has stated that a single case from another circuit is not sufficient to clearly establish the law in this circuit."); <u>Lee v. Dugger</u>, 902 F.2d 822, 824 (11th Cir. 1990) ("Here, only one case, decided by an intermediate appellate court, had construed the new statute, which falls short of the clarity of the law required to defeat a defense of qualified immunity."); <u>Soto v. Lord</u>, 693 F. Supp. 8, 17 (S.D.N.Y. 1988) (similar). <u>Cf.</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 617 (1999) ("Petitioners have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful."). To hold otherwise severely undermines qualified immunity.

In an analogous case from our court, we concluded a "policy of shackling pre-trial detainees while they receive medical attention [did not] constitute[] . . . deliberate indifference to medical needs or a punishment." <u>Haslar v. Megerman</u>, 104 F.3d 178, 180 (8th Cir. 1997) (internal citations omitted). In <u>Haslar</u>, a pretrial detainee was admitted to the hospital for renal failure. <u>See</u> <u>id.</u> at 179. Despite the fact the detainee was "virtually comatose" during the first few days of his hospital stay, officers shackled and chained his legs to the bed. <u>Id.</u> The detainee's legs became severely swollen, and after the detainee regained consciousness, he and his mother repeatedly complained the shackles were too tight. <u>Id.</u> The officers did not check the restraints and did not request that a nurse examine the detainee's legs. <u>Id.</u> The officers kept the detainee shackled during the entire hospital stay. <u>Id.</u> As a result, the detainee could not walk when he left the medical center and suffered permanent leg damage. <u>Id.</u>

Because the officers were not named defendants in <u>Haslar</u>, the court did not consider whether the officers' personal conduct violated the detainee's Eighth Amendment rights. <u>See</u> <u>Haslar</u>, 104 F.3d at 180. Nevertheless, <u>Haslar</u>

-26-

demonstrates the "contours" of this new constitutional right discovered by the majority, the right of a female inmate to be free from restraints while in labor, was not sufficiently clear in our circuit such that a reasonable official would have had fair notice and understood restraining Nelson under the circumstances of this case rose to a constitutional violation.  See Anderson, 483 U.S. at 640; Lindsey v. City of Orrick, Mo., 491 F.3d 892, 902 (8th Cir. 2007) (quoting Anderson).

In Haslar, our court declared, "Admitting pre-trial detainees to a hospital concretely demonstrates a deliberate concern for their medical well-being, and not an indifference."  Haslar, 104 F.3d at 180.  The court also stated the policy of shackling pretrial detainees while they receive medical attention "serves the legitimate penological goal of preventing inmates awaiting trial from escaping [the hospital's] less secure confines, and is not excessive given that goal."  Id.  Finally, our court emphasized the fact that the restraint policy in Haslar contained safeguards in order to minimize potential harm to detainees.  Id.  The ADC policies in place on September 20, 2003, which Officer Turensky followed, also contained safeguards.  Our precedent in Haslar supports the position that any constitutional right Nelson may have had to be free from restraints was not clearly established, and a reasonable officer in Officer Turensky's position would not have understood it was a constitutional violation to restrain Nelson.  Officer Turensky plainly did not have fair notice her conduct could be unconstitutional.

The majority also suggests Hope v. Pelzer, 536 U.S. 730 (2002), and Estelle v. Gamble, 429 U.S. 97 (1976), demonstrate Nelson had a clearly established constitutional right to be free from restraints during labor.  In Hope, the Supreme Court concluded prison guards subjected a prisoner to cruel and unusual punishment when the guards handcuffed the prisoner to a hitching post on two occasions "to sanction him for disruptive behavior."  Hope, 536 U.S. at 733.  On the first occasion, the prisoner got into an argument with another inmate while working on a chain gang, and the guards took the prisoner back to the prison and handcuffed him to a hitching post for two hours.  See id. at 734.  The prisoner's

arms were handcuffed to the hitching post above shoulder level, and "the handcuffs cut into his wrists, causing pain and discomfort." Id. On the second occasion, the prisoner got into an altercation with a guard upon arrival at a chain gang worksite, and the prisoner was transported back to the prison and handcuffed to the hitching post for seven hours. See id. at 734-35. The guards made the prisoner take off his shirt, and his skin was sunburned. See id. The guards gave the prisoner water only once or twice over the seven-hour period, and the prisoner was not given any bathroom breaks. See id. at 735. According to the prisoner, "[The guard] first gave water to some dogs, then brought the water cooler closer to [the prisoner], removed its lid, and kicked the cooler over, spilling the water onto the ground." Id.

In Hope, the prisoner was handcuffed to a hitching post, taunted, made to suffer unnecessarily and wantonly, and denied the basic necessities of life purely for punishment purposes. See id. at 738. Safety concerns had long passed. See id. Unlike Nelson's case, Hope did not involve a balancing of security and inmate safety concerns when an inmate is taken outside the confines of the prison. See Haslar, 104 F.3d at 180 ("It is eminently reasonable to prevent escape attempts at the outset by restraining hospitalized inmates to their beds."). Nelson was not being punished, was not made to suffer unnecessarily and wantonly, and was not deprived of basic necessities of life. On the contrary, Nelson was in a hospital under the care of medical personnel. Hope cannot fairly be read to put a reasonable officer on notice that restraining a female inmate in a hospital bed during child labor, and removing the restraints when requested to do so by medical personnel, would be a constitutional violation.

The majority's reliance on Estelle likewise is misplaced. Estelle does not address the use of restraints on prison inmates. Instead, the issue in Estelle was whether an inmate received constitutionally inadequate medical care following a prison work-related injury. Estelle, 429 U.S. at 98. The Supreme Court determined,

-28-

> [D]eliberate indifference to serious medical needs of prisoners
> constitutes the unnecessary and wanton infliction of pain, proscribed
> by the Eighth Amendment. This is true whether the indifference is
> manifested by prison doctors in their response to the prisoner's needs
> or by prison guards in intentionally denying or delaying access to
> medical care or intentionally interfering with the treatment once
> prescribed.

Id. at 104-05 (internal marks and citation omitted). There is no allegation, and nothing in the record to suggest, Officer Turensky interfered with Nelson's medical care. Nelson concedes Officer Turensky complied with all requests of the medical personnel. Estelle provides no guidance to officers on the appropriate use of restraints on an inmate when transporting the inmate to a medical facility for the purpose of receiving medical care, and, thus, would not have put a reasonable officer on notice that restraining a female inmate in a hospital bed during labor was a violation of the inmate's constitutional rights.

In its discussion of the clearly established prong of the qualified immunity analysis, the majority states that Officer Turensky is presumed to be aware of the law and the ADC policies and regulations in place on September 20, 2003. See ante at 19. The majority discusses Regulation 403 and Administrative Directive 95:21, but the majority misinterprets the impact of the Hospital Security Officer Post Order (Post Order), which was also in effect as of August 1, 2003. Post Order III.A.3 expressly addressed the restraint of pregnant inmates and is directly on point:

> **Pregnant inmates in the final stages of labor will not be restrained**
> while in the delivery room giving birth, or **at any time the physician
> in charge determines that such application would be a health risk
> to the unborn child or the health of the inmate.**

(emphasis added). The majority maintains the Post Order is inapplicable because "the focus of Nelson's constitutional challenge is on the period before she was

taken to the delivery room," and "[the Post Order] did not govern before Nelson entered the delivery room."  Ante at 18 n.8, 22 n.10.  I disagree with the majority's interpretation of the Post Order.  The plain language of the Post Order declares the Post Order applied not only to labor in the delivery room, but also "at any time the physician in charge determines that such application would be a health risk to the unborn child or the health of the inmate."

Using the logic of the majority that Officer Turensky's knowledge of the ADC regulations, directives, and orders "is presumed and they applied to [Officer Turensky's] decisions and actions in September 2003," ante at 19, Officer Turensky fully complied with the Post Order.  Nelson conceded in her deposition testimony that when the obstetrician arrived, the obstetrician requested that Officer Turensky remove the restraints, and Officer Turensky did so.  Whenever medical personnel requested removal of the restraints, Officer Turensky removed the restraints.  Officer Turensky did her job according to ADC protocol.  Officer Turensky acted without any notice or warning to indicate her conduct could violate Nelson's constitutional right.

Even if Nelson's allegations, taken in the light most favorable to Nelson, state a violation of Nelson's constitutional right, that right was not clearly established such that a reasonable officer would have understood his or her actions violated the Constitution.  Officer Turensky should not be made "to stand trial or face the other burdens of litigation."  See Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)), abrogated on other grounds by Pearson, __ U.S. at __, 129 S. Ct. at 818.

## II.    Constitutional Violation?

The focus of our constitutional violation inquiry is whether Officer Turensky's placement of Nelson's legs in restraints attached to the handrail of the hospital bed while Nelson was in labor constitutes deliberate indifference to Nelson's serious medical needs.  Officer Turensky stated it was not her preference

to use leg restraints on pregnant inmates, but she believed she was required to do so.  During Officer Turensky's deposition, Officer Turensky was asked about her decision to place Nelson in restraints while Nelson lay in the hospital bed.  The following exchange occurred:

> Q      What made you decide at that particular time, Officer Turensky, to put the shackles on?
> A      Because if I don't and the Warden shows up at the hospital – which she has done on occasion – she would write me up.

Officer Turensky also testified that while she did not feel threatened by Nelson, she had some concern regarding whether Nelson was a flight risk.  Officer Turensky was asked, "At any time, did you feel that Ms. Nelson was a flight risk?"  Officer Turensky responded, "I had my doubts, yes, ma'am."  Officer Turensky explained, "Because I did not know what [Nelson's] crime was and the way she was talking about how she should not be considered an inmate because she was in the free world in a free-world hospital, that made me a tad nervous."

In Haslar, we explained:

> A single armed guard often cannot prevent a determined, unrestrained, and sometimes aggressive inmate from escaping without resorting to force.  It is eminently reasonable to prevent escape attempts at the outset by restraining hospitalized inmates to their beds.

Haslar, 104 F.3d at 180 (dealing with a "virtually comatose" pretrial detainee).

In assessing whether Officer Turensky's conduct constituted deliberate indifference to Nelson's serious medical needs, it is important to note Officer Turensky did not have any medical training, and specifically no training related to pregnancy and childbirth.  Officer Turensky relied on the medical judgment of the medical personnel as to when it was medically necessary to remove the restraints.

The record demonstrates Officer Turensky removed the restraints from Nelson every time medical personnel requested her to do so.  There is no evidence and no allegation Officer Turensky refused to comply with any of the medical personnel's requests or instructions.  While Nelson claims, in the presence of Officer Turensky, one nurse commented that "[s]he wished that they wouldn't have to put those restraints on [Nelson]," there is no evidence in the record any of the medical personnel ever told Officer Turensky the use of restraints on Nelson posed a danger to Nelson or her unborn child.

At oral argument, Nelson's counsel conceded neither the actions nor the inactions of the medical personnel placed Nelson in any danger.  The majority effectively holds Officer Turensky to a higher standard than the medical personnel to recognize a potential medical danger to Nelson or her baby.

The majority suggests Officer Turensky should have been aware of the risks involved with labor and childbirth because they are obvious, see ante at 11 n.4,[13] and states a factfinder could infer "[Officer] Turensky recognized that the shackles interfered with Nelson's medical care, could be an obstacle in the event of a medical emergency, and caused unnecessary suffering at a time when Nelson would have likely been physically unable to flee," ante at 13.  Officer Turensky delivered Nelson safely to a hospital and into the care of trained, professional medical personnel.  As we recognized in Haslar, admitting an inmate "to a hospital

---

[13]The majority references the movie Gone With The Wind to support its position that it should have been obvious to Officer Turensky that the use of restraints posed a risk of harm to Nelson.  Medical knowledge and care of pregnant women have advanced significantly since the 1860s.  Nelson's son was delivered in a medical facility at the hands of trained medical professionals.  Officer Turensky escorted Nelson to the modern medical facility, and the hospital's medical experts assessed any risks of harm to Nelson and her baby, including use of the restraints.  Officer Turensky completely complied with ADC policies and all of the medical experts' directions and requests.

concretely demonstrates a deliberate concern for [the inmate's] medical well-being, and not an indifference." <u>Haslar</u>, 104 F.3d at 180.  It was then the duty of the medical personnel to make medical decisions and to assess and recognize any medical dangers or risks to Nelson or her baby, including any obstacles to medical care and the avoidance of unnecessary suffering.  The medical personnel treating Nelson certainly were aware of the inherent risks of childbirth and knew, better than Officer Turensky, how to avoid or minimize those risks, which was their professional responsibility.  The medical personnel requested removal of the restraints from Nelson when removal was deemed medically necessary, and Officer Turensky always complied by removing the restraints.

Nelson does not contend, and the record does not indicate, she told Officer Turensky or the medical personnel that the shackles were causing her pain or suffering.  A complaint of pain may have put Officer Turensky on notice of an unattended serious medical need or gratuitous infliction of pain.  Without such a warning, Officer Turensky did not act with deliberate indifference.

## III.    Conclusion

Nelson did not meet her burden to allege and show Officer Turensky violated a clearly established constitutional right.  Officer Turensky is entitled to qualified immunity.  I would reverse the district court in all respects.

———————————————————

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
www.ca8.uscourts.gov

October 02, 2009

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  07-2481  Shawanna Nelson v. Larry Norris, et al

Dear Sirs:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellant was Scott Paris Richardson, AAG, Little Rock, AR.  Also appearing on the brief was Christine Ann Boozer, AAG, Little Rock, AR.

Counsel who presented argument on behalf of the appellee was Elizabeth Alexander, Washington, D.C.  Also appearing on the brief was Cathleen V. Compton, Little Rock, AR.

Appearing on the amicus brief on behalf of the appellee was Charles M. Kester, Fayetteville, AR.; Tiloma Jayasinghe, Lynn M. Paltrow, and Catherine Albisa, all of New York, NY.

The judge who heard the case in the district court was Honorable James M. Moody. The judgment of the district court was entered on June 11, 2007.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

DMH

Enclosure(s)

cc:  Lois Law
     MO Lawyers Weekly

District Court/Agency Case Number(s):   1:04-cv-00037-JMM

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
## St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

October 02, 2009

Mr. Scott Paris Richardson
ATTORNEY GENERAL'S OFFICE
323 Center Street
200 Catlett-Prien Building
Little Rock, AR  72201-0000

RE:  07-2481  Shawanna Nelson v. Larry Norris, et al

Dear Counsel:

The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

Michael E. Gans
Clerk of Court

DMH
Enclosure(s)

cc:    Ms. Catherine Albisa
       Ms. Elizabeth Alexander
       Ms. Christine Ann Boozer
       Ms. Cathleen V. Compton
       Ms. Tiloma Jayasinghe
       Mr. Charles M. Kester
       Mr. Jim McCormack
       Ms. Lynn M. Paltrow
       Cynthia Soohoo
       Ms. Stephanie Toti

District Court/Agency Case Number(s):  1:04-cv-00037-JMM



8cc-cmecf-nda@ck8.uscourts.
gov

10/02/2009 09:15 AM

To

cc

bcc

Subject   07-2481 Shawanna Nelson v. Larry Norris, et al "Signed
Opinion Filed"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

### Eighth Circuit Court of Appeals

**Notice of Docket Activity**

The following transaction was filed on 10/02/2009

| | |
|---|---|
| **Case Name:** | Shawanna Nelson v. Larry Norris, et al |
| **Case Number:** | 07-2481 |
| **Document(s):** | Document(s) |

**Docket Text:**
OPINION FILED - THE COURT: JAMES B. LOKEN, ROGER L. WOLLMAN, DIANA E. MURPHY, KERMIT E. BYE, WILLIAM JAY RILEY, MICHAEL J. MELLOY, LAVENSKI R. SMITH, STEVEN M. COLLOTON, RAYMOND W. GRUENDER, DUANE BENTON and BOBBY E. SHEPHERD. Diana E. Murphy, Authoring Judge. (PUBLISHED). CONCUR IN PART AND DISSENT IN PART BY: WILLIAM JAY RILEY with whom JAMES B. LOKEN, STEVEN M. COLLOTON, RAYMOND W. GRUENDER and BOBBY E. SHEPHERD join. [3591658] [07-2481] (DMH)

The following document(s) are associated with this transaction:
**Document Description:**Signed Opinion Filed
**Original Filename:**072481P.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=10/02/2009] [FileNumber=3591658-0]
[cbf9ebb3734a350b504b78f1bc57845978434e11fb2888797178102935b456369d88388fea656aef
839cceb099cd599a162809122e23e625ff00e0f54dcc27f0]]

**Document Description:**Letter To Publishing
**Original Filename:**
/opt/ACECF/live/forms/dhogenmiller_072481_3591658_LettersToPublishing_284.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=10/02/2009] [FileNumber=3591658-1]

[bf54f477e3c86c2fd6812061428cd057cb9bd768f59b9c483d79c13769a700dbe76ff76c7b4871e0
97a09a5b8cd3cd30f32b53175646f7241774ab4202c14981]]

**Recipients:**

- [Lois Law](#)
- [MO Lawyers Weekly](#)
- [West Publishing](#)


**Document Description:**Counsel Opinion Letter
**Original Filename:**
/opt/ACECF/live/forms/dhogenmiller_072481_3591658_CounselOpinionLetters_285.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=10/02/2009] [FileNumber=3591658-2]
[03a8ad5ae07e5cca23114d45ee48ed8eeb01878b1b81ce3b12b81f12d183f906df281e84f1d343f2
ec278230e0c9bb6cae526684b3ae6daf270aaeaf1268597a]]

**Recipients:**

- [Ms. Albisa, Catherine](#)
- [Ms. Alexander, Elizabeth, Director](#)
- [Ms. Boozer, Christine Ann, Acting Assistant Attorney General](#)
- [Ms. Compton, Cathleen V.](#)
- [Ms. Jayasinghe, Tiloma](#)
- [Mr. Kester, Charles M.](#)
- [Mr. McCormack, Jim, Clerk of Court](#)
- [Ms. Paltrow, Lynn M.](#)
- [Mr. Richardson, Scott Paris, Assistant Attorney General](#)
- [Soohoo, Cynthia](#)
- [Ms. Toti, Stephanie](#)


**Notice will be electronically mailed to:**

Ms. Alexander, Elizabeth, Director: ealexander@npp-aclu.org, mtartaglia@npp-aclu.org,
agathers@npp-aclu.org
Ms. Boozer, Christine Ann, Acting Assistant Attorney General:
christine.boozer@arkansasag.gov
Ms. Compton, Cathleen V.: vicki@cathicomptonlaw.com, cathi.compton@sbcglobal.net
Mr. Kester, Charles M.: Cmkester@nwark.com, pauline@kester.arcoxmail.com
Mr. McCormack, Jim, Clerk of Court: ared_appeals@ared.uscourts.gov
Mr. Richardson, Scott Paris, Assistant Attorney General: scott.richardson@arkansasag.gov,
danielle.williams@arkansasag.gov
Ms. Toti, Stephanie: stoti@reprorights.org, rfriedman@reprorights.org
Lois Law: FED08@loislaw.com
MO Lawyers Weekly: smaniscalco@mo.lawyersweekly.com
West Publishing: us08@westdcs.west.thomson.com

**Notice will be mailed to:**


Ms. Albisa, Catherine
NATIONAL ECONOMIC AND SOCIAL RIGHTS INITIATIVE
90 John Street
Suite 308
New York, NY 10038

Ms. Jayasinghe, Tiloma
NATIONAL ADVOCATES FOR PREGNANT WOMEN
15 w. 36th Street
Suite 901
New York, NY 10018

Mr. McCormack, Jim, Clerk of Court
U.S. DISTRICT COURT
Eastern District of Arkansas
600 W. Capitol Avenue
Room A149
Little Rock, AR 72201-0000

Ms. Paltrow, Lynn M.
NATIONAL ADVOCATES FOR PREGNANT WOMEN
15 W. 36th Street
Suite 901
New York, NY 10018

Soohoo, Cynthia
CENTER FOR REPRODUCTIVE LAW & POLICY
120 Wall Street
14th Floor
New York, NY 10005-0000

The following information is for the use of court personnel:


**DOCKET ENTRY ID:** 3591658
**RELIEF(S) DOCKETED:**
  for publication
  concurrence
  dissent
**DOCKET PART(S) ADDED:** 4014002, 4014003, 4014004, 4014005, 4014006